807 P.2d 610

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Barrette Luke ENNO,
Defendant–Appellant.**

**No. 18119.**

Supreme Court of Idaho.

Jan. 9, 1991.

Rehearing Denied April 8, 1991.

McDermott, Zollinger, Olley & Israel, Pocatello, for appellant. Keith A. Zollinger argued, Pocatello.

Jim Jones, Idaho Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for respondent. Lynn E. Thomas argued, Boise.

BOYLE, Justice.

This is a criminal case concerning a first degree murder conviction and fixed-life sentence of defendant Barrette Luke Enno. Enno asserts that during the course of the trial certain fundamental constitutional errors occurred, which together with other evidentiary and instructional error, require reversal. Enno also asserts that the sentencing court failed to consider his potential for rehabilitation and other factors in imposing a fixed life sentence.

## I.

## FACTS

On October 25, 1988, eighteen-year-old Enno met Joanne Freeman, a woman twenty-four years his senior, at a bar in Pocatello.[1] After Enno sold Freeman some marijuana they traveled to another bar and consumed more beer. Thereafter they traveled to an area west of Pocatello and parked. Freeman apparently desired to have sexual intercourse and began taunting Enno. He refused and threatened to kill her if she did not stop her advances. Freeman laughed at him and Enno grabbed her throat. He continued to choke Freeman until blood came from her mouth. During the ensuing struggle both individuals ended up outside of the automobile on the passenger side. Enno beat Freeman with a board, striking her in the throat which crushed her larynx causing her to suffocate. When Enno thought he still saw signs of Freeman breathing he got into the automobile and drove over her body three times. The impact with the vehicle and its exhaust system burned and lacerated Freeman's body. After running over her with the automobile, Enno burned the body with lighter fluid and charcoal. Enno then returned to his brother's house in Pocatello. After talking about the events of the evening with his brother he ate and went to bed.

Enno was subsequently arrested and charged with murder in the first degree. After a week long trial the jury found Enno guilty of first degree murder. Since the State sought the death penalty an aggravation/mitigation hearing was held. The sentencing court determined that the State had proven two aggravating circumstances beyond a reasonable doubt pursuant to I.C. § 19–2515(g). The aggravating circumstances found by the trial court were that the murder was "especially heinous, atrocious and cruel" under subsection (g)(5) and that "by the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life" under subsection (g)(6).

In mitigation of the aggravating circumstances the sentencing court found the following:

> The defendant was eighteen at the time the murder was committed. He was the victim of physical abuse and had been raised in an extreme alcoholic family where he had *virtually* no direction or protection from his earliest childhood. The defendant had been drinking heavily for a period two weeks preceding the murder—excessively that day and had used marijuana that evening. The defendant had no violent criminal record. The defendant has performed well in structured environments and regressed in those situations only when faced with the possibility of returning to his abusive alcoholic home. He has been a model prisoner during his present period of incarceration. He is intelligent and has some limited employment skills.

> The defendant has expressed some remorse for his actions, which indicates that he is starting to at least recognize and deal with his abusive childhood, antisocial personality, and the rage he possesses.

> . . . .

> The defendant cooperated with police in the investigation, submitting to inter-

---

1. Evidence in the record reveals that Enno was not able to recall many of the events of the night Freeman was killed as a result of a psychological "blackout," however, the record contains extensive testimony from family members and others of statements made to them by Enno shortly after the killing. Many of the facts relied upon by the trial court and jury came from these collateral sources based on statements made by Enno on that night.

rogation and confessing his involvement. The defendant may be able to handle life once drugs are removed from his life. (Emphasis in original.)

The sentencing court sentenced Enno to a fixed life term with no possibility of parole. This appeal was then filed.

## II.

### PEREMPTORY CHALLENGES

■ Enno claims that the manner in which the peremptory challenges were exercised violated I.C. § 19–2030 constituting fundamental error, and denied Enno his right to a fair trial. We disagree.

The record indicates that after the State exercised its second peremptory challenge the court instructed the attorneys that they would thereafter exercise peremptory challenges in alternating rounds. The record is unclear as to how this procedure actually occurred[2]; but it appears from a careful reading of the record and the helpful briefs of counsel that the State exercised its peremptory challenge first on rounds one, two, five, seven and nine and the appellant exercised the first peremptory in rounds three,

four, six, eight and ten.[3] The effect of this procedure is that after round four both the State and appellant exercised peremptory challenges two at a time. Appellant waived his sixth and eighth peremptory challenges.

Idaho Code § 19–2030 governs the manner in which juror peremptory challenges are conducted and states:

**Alteration of peremptory challenges.—** After the jury is passed for cause, both parties alternately, beginning with the people, may take their peremptory challenges. But no challenge is lost by failure to alternate if the panel is opened by the other party; and each party is entitled to a full panel before exercising a peremptory challenge. Provided, however, in the discretion of the court, the number of jurors who will hear the case, plus a number of jurors representing the total number of possible peremptory challenges, may be called and examined for cause before the parties begin to exercise their peremptory challenges.

In this case thirty-five jurors were passed for cause. Each party was entitled to a total of eleven peremptory challenges,

2. The record states:
THE COURT: ... Counsel, we'll exercise peremptory challenges at this time. Ladies and gentlemen, as you can see, we're going a little over 5 o'clock, but this way some of you won't have to come back tomorrow.
(peremptory challenges exercised)
MR. ECHOHAWK: Your Honor, may I have a bench conference?
THE COURT: Yes.
(discussion off the record)
(peremptory challenges exercised)
MR. ZOLLINGER: Your Honor, do you want me to exercise the peremptories up there?
THE COURT: That will be your—
You've exercised two now, Mr. EchoHawk,—
MR. ECHOHAWK: Yes, your Honor.
THE COURT: —or one?
MR. ECHOHAWK: Two.
MR. ZOLLINGER: Shall we just do them and then send them to the Court?
THE COURT: And you've exercised—
MR. ZOLLINGER: One.
THE COURT: One? You should have exercised the peremptory first. You rotate on rounds.
MR. ZOLLINGER: I thought that's what—I'm not sure I understand, your Honor.
THE COURT: Mr. EchoHawk, you exercised first on each of the two rounds.
MR. ECHOHAWK: That's right, your Honor.

THE COURT: You will take the next two rounds first as the first peremptory, and then we will rotate them after—do you understand that, Mr. Zollinger?
MR. ZOLLINGER: I understand what the Court said, yes.
THE COURT: Okay.
(peremptory challenges exercised)
It's your round first, Mr. Zollinger.
MR. ZOLLINGER: I've already taken it; I'm done.
MR. ECHOHAWK: He'll take the next two.
THE COURT: Counsel, would you come forward?
Let's make sure we've got his straight.
(Discussion off the record)
(Peremptory challenges exercised)
THE COURT: Counsel, would you come forward, please?
(Discussion off the record)
You both agree that is the jury?
MR. ECHOHAWK: Yes, your Honor.
MR. ZOLLINGER: Yes, your Honor.

3. I.C.R. 24(b) allows ten peremptory challenges if the offense charged is punishable by death or life imprisonment.

including one for an alternate juror, and the peremptory challenges were exercised in a series of rounds or alternatively as provided in I.C. § 19–2030. Although the method utilized by the trial court in this case was unconventional and not a recommended procedure, it did not significantly vary from the regular manner of exercising peremptory challenges sufficient to constitute reversible error. Further, no objection was made by either party to the procedure utilized. Appellant was allowed to exercise one of his peremptory challenges in each round and was allowed to continue to exercise his peremptory challenges even after he had waived challenges in rounds six and eight. The peremptory challenges were alternately exercised by the parties as required by I.C. § 19–2030.

Appellant argues on appeal that *State v. Carringer*, 84 Idaho 32, 367 P.2d 584 (1961), and *State v. Latham,* 98 Idaho 558, 569 P.2d 362 (1977), which prohibit certain jury selection practices, should apply in this case. Those cases, however, are distinguishable from the present circumstances. In *State v. Carringer*, 84 Idaho 32, 367 P.2d 584 (1961), this Court held that the struck jury method utilized by the trial court was at such variance from the statutory requirement that it required a new trial. Since *Carringer* was decided in 1961, however, I.C. § 19–2030 has been amended by adding the last sentence which remedies the particular problem encountered in that case.[4] In any event, the struck jury method utilized by the court in this instant case is approved procedure pursuant to I.C.R. 24(d).[5]

Enno also asserts that the manner in which the jury selection process was conducted not only was in violation of I.C. § 19–2030, but was such a departure from accepted practice that it constituted fundamental error. In support of his argument, Enno relies on *State v. Carver*, 94 Idaho 677, 496 P.2d 676 (1972), in which this Court held that the physical absence of the defendants during the impaneling of the jury was fundamental error requiring reversal. Unlike the unusual setting involved in *Carver*, however, Enno was physically present during the entire voir dire process, conferred with his attorney and participated in the selection of the jury. The facts presented in *Carver* and this case are easily distinguishable. The manner of impaneling the jury in this instant case did not constitute fundamental error requiring reversal.

In *State v. Latham,* 98 Idaho 558, 569 P.2d 362 (1977), the State waived its peremptory challenges. After the defendant had exercised his challenges, the trial court offered the State the opportunity to exercise its peremptory challenges and limited the replacement pool to two people. In both *Carringer* and *Latham* the procedural irregularity employed was not a mere mistake in procedure but a substitution of procedure in direct violation of the statute. In this instant case there is no direct violation of the statute, only an irregular application of the peremptory challenge procedure. Neither party was given more peremptory challenges than the other, and the peremptory challenges were exercised alternately in rounds as required by I.C. § 19–2030, with the State beginning the

---

4. **19–2030. Alteration of peremptory challenges.**—After the jury is passed for cause, both parties alternately, beginning with the people, may take their peremptory challenges. But no challenge is lost by failure to alternate if the panel is opened by the other party; and each party is entitled to a full panel before exercising a peremptory challenge. Provided, however, in the discretion of the court, the number of jurors who will hear the case, plus a number of jurors representing the total number of possible peremptory challenges, may be called and examined for cause before the parties begin to exercise their peremptory challenges.

5. **Rule 24. Trial jurors.**—

....

(d) Use of a struck jury. The court may, in its discretion, cause a panel of jurors to be questioned and passed for cause in a number equal to the number of jurors and alternates required for the final jury and an additional number equal to the number of peremptory challenges of the parties. Such prospective jurors when chosen shall be seated in such manner as to be designated numerically with the lower numbered jurors constituting the initial panel and alternate jurors, and the subsequent number jurors becoming the replacement jurors in the event any of the jurors of the original panel are removed by a peremptory challenge.

process. Enno was personally present during the voir dire process and did not object at any time to the procedure followed by the trial court, nor has he shown any prejudice. We point out that the procedure followed by the trial court was irregular and is not a recommended practice, however, because there was no objection at trial and no prejudice has been shown we do not find reversible error in this procedure.

### III.

### JURORS DISMISSED FOR CAUSE

During the voir dire process the trial court questioned jurors concerning their attitudes, views and opinions toward the death penalty. Based on responses given during this process the State posed additional questions concerning the death penalty to four specific jurors. Based upon the responses given the State challenged three of those jurors pursuant to I.C. § 19–2020(9).[6] Before ruling on the State's challenges, the trial court also posed a series of questions and subsequently dismissed all four jurors for cause.

Enno asserts that these four jurors were improperly excluded for cause, thereby denying him of his right to a fair trial under the Idaho Constitution and United States Constitution. Enno first argues that the excused jurors' bias did not reach the level required in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and all four were therefore, wrongly excluded. Secondly, Enno argues that the manner in which the four jurors were excluded essentially granted the State an additional four peremptory challenges and denied him the corresponding right to exclude jurors who, upon concluding the defendant was guilty, would automatically vote for first degree murder instead of a lesser included offense. Enno does not assert that "death qualifying" a jury is per se improper, but that the manner in which the qualifying procedure was conducted in

this case denied him his constitutional right to a fair and impartial jury.

### A. Exclusion of Jurors Objecting to the Death Penalty under *Witherspoon.*

■ We will first address Enno's argument that the four jurors were improperly excluded for cause. In *Witherspoon* the United States Supreme Court held that the state infringes upon a defendant's right under the sixth and fourteenth amendments to a trial by an impartial jury if the jury imposing or recommending the death penalty "was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* 391 U.S. at 522, 88 S.Ct. at 1777. In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court clarified its decision in *Witherspoon* by stating:

> This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Wainwright v. Witt,* 469 U.S. at 420, 105 S.Ct. at 850 (quoting from *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). (Emphasis in original.)

When jurors acknowledge that the potential imposition of the death penalty could affect their deliberations it may only indicate that they would be more emotionally involved or would view their task with greater seriousness and gravity. Such an effect does not demonstrate that prospec-

---

6. **19–2020. Grounds of challenge for implied bias.**—A challenge for implied bias may be taken for all or any of the following causes and for no other:

 . . . .

(9) If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror.

tive jurors are necessarily unwilling or unable to follow the law or obey their oaths. *Id.* The proper inquiry to be posed in this procedure is whether or not the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424, 105 S.Ct. at 852. As noted by the United States Supreme Court in *Wainwright v. Witt,* the juror's bias need not be proven with "unmistakable clarity." *Id.*

In Idaho the trial judge, rather than the jury, sentences defendants found guilty of capital crimes. *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). The fact that a jury does not involve itself with the sentencing phase of the criminal process does not bar the state from "death qualifying" the jury. The United States Supreme Court in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), held that the Constitution does not prohibit "death qualifying" juries prior to the guilt phase of a trial. In *State v. Johns,* 112 Idaho 873, 736 P.2d 1327 (1987), this Court upheld the constitutionality of I.C. § 19–2020 and the procedure of "death qualifying" a jury in a capital case even though the jury does not participate in the sentencing process. As this Court held in *State v. Johns,* 112 Idaho 873, 880, 736 P.2d 1327, 1333 (1987), I.C. § 19–2020(9) provides that even though punishment is not a jury question, it is proper to exclude a juror if he or she objects to the death penalty. 112 Idaho at 880, 736 P.2d at 1333. Further, in affirming the district court we noted in *Johns* that the constitutionality of this particular type of statute has been upheld by the United States Supreme Court in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *State v. Creech,* 99 Idaho 779, 589 P.2d 114 (1979); and *State v. Wilson,* 41 Idaho 616, 243 P. 359 (1925); *see State v. Johns,* 112 Idaho at 880, 736 P.2d at 1333. The "death qualifying" jury selection procedure is well established in Idaho and approved in a sub-

stantial body of case law from the United States Supreme Court. The utilization of this procedure by the trial court in the instant case was not error.

### B. Trial Court's Decision to Dismiss Jurors is Discretionary.

■ Since "death qualifying" a jury is a recognized and proper procedure, we must now determine whether the trial court erred in excluding the four jurors following their questioning by both the court and counsel. In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court determined that the appropriate standard of review under federal habeas corpus review of a case involving the death qualifying of a jury is a "presumption of correctness."[7] *Id.,* 469 U.S. at 426, 105 S.Ct. at 853. In *Wainwright* the United States Supreme Court determined that great deference must be given to the trial judge who is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. *Id.* The reason is that the determination of demeanor and credibility are peculiarly within a trial judge's province. *Id.* 469 U.S. at 428, 105 S.Ct. at 854. The United States Supreme Court's determination that exclusion of jurors pursuant to a *Witherspoon* challenge in the trial judge's discretion is in accordance with our own Idaho law. In *State v. Hedger,* 115 Idaho 598, 768 P.2d 1331 (1989), this Court held it was within the trial judge's discretion to determine whether a juror can render a fair and impartial verdict and that absent an abuse of discretion the trial court's decision will be affirmed on appeal. *See also State v. Merrifield,* 109 Idaho 11, 704 P.2d 343 (Ct.App. 1985).

After a careful review of the record we find no abuse of discretion by the trial court. The record supports a finding that the four jurors dismissed for cause had views on imposition of the death penalty that would substantially impair the performance of their duties or would interfere with their judgment on the case. The dia-

---

7. This standard is based upon the federal habeas

corpus review statute, 28 U.S.C. § 2254(d).

logue between the trial court and the four jurors clearly sets forth the views of the jurors on this issue:

> THE COURT: I want to examine those three particular individuals and Mrs. Nelson a little further, Mr. EchoHawk, and then I'll rule on your motion.
>
> Mr. Coutis and Mr. Tatum and Mr. Wheatley and Mrs. Nelson, my question is going to be directed to you, and I want to explain one thing. First of all, it is not the jury's responsibility, under Idaho law, to determine a sentence in a case. It's the Court's decision, and if there is a conviction, regardless of what it is for, in this case, it will be my responsibility to impose sentence.
>
> However, what we want to explore is whether or not what a potential sentence might be might affect your view of the evidence for determining either guilt or innocence. We want you to be able to follow the law, as I will explain it to you, and make a decision as to guilt or innocence in this case based on the evidence and the instructions, not what you perceive potential sentences may be, and that's where the question comes down.
>
> With that additional explanation, of those four of you who indicated those earlier responses, are any of you in a position that you would say, *regardless of the evidence presented by the State, I simply cannot return a verdict of guilty of first degree murder because I know that there is a potential death sentence?* That's the question, plain and simple. Mr. Coutis?
>
> JUROR COUTIS: I don't think I could.
>
> THE COURT: All right. Mr. Tatum?
>
> JUROR TATUM: I wouldn't.
>
> THE COURT: Mr. Wheatley?
>
> JUROR WHEATLEY: No.
>
> THE COURT: And Mrs. Nelson?
>
> JUROR NELSON: No, I wouldn't.
>
> THE COURT: All right. I will excuse each of the four of you for cause. (Emphasis added.)

As stated in that dialogue by the trial court, each of the jurors stated that they would not return a guilty verdict regardless of the evidence presented because of the potential of a death penalty sentence. A careful review of the entire jury voir dire process reveals that on other occasions jurors Nelson and Coutis indicated that they would have difficulty following the court's instructions concerning intoxication. Juror Tatum indicated earlier that he would have trouble hearing enough evidence to convict someone of first degree murder. Juror Wheatley also specifically indicated earlier in the voir dire process that he could not follow the court's instructions knowing that a possible death sentence could be given.

In *Wainwright* the United States Supreme Court stated that:

> [D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear;" these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.

*Id.* at 469 U.S. 424–25, 105 S.Ct. at 852.

The findings of the trial court that these four jurors should be dismissed for cause are fairly supported by the record and we find no abuse of discretion.

### C. *Fairness of Death Qualifying Procedure Utilized.*

We will now consider Enno's second argument that the application of I.C. § 19–2020(9) in "death qualifying" the jury in this case is unfair because it gave the State four additional peremptory challenges and denied Enno the corresponding right to exclude jurors who, upon concluding the defendant was guilty, would automatically vote in favor of a first degree murder conviction rather than a lesser included offense. We first note that Enno did not challenge any jurors for cause on this point during the voir dire process.

Secondly, pursuant to I.C. § 19–2020(8),[8] any jurors who exhibited an unqualified opinion or belief that the defendant is guilty or not guilty of the offense charged should be dismissed for cause. Enno accepted the jury panel and passed all jurors for cause following the voir dire process. We note that Enno's counsel, a competent and experienced criminal defense lawyer, asked questions during the voir dire process in an attempt to find jurors who might exhibit bias or to determine whether any of the jurors exhibited an unqualified opinion or belief that defendant was guilty of the offense charged. No responses were elicited.

It is clear from the record that the jury panel passed for cause by Enno was an impartial jury. There is no evidence that any of the jurors were biased or partial in favor of conviction prior to hearing the evidence. The United States Supreme Court addressed the issue of jury impartiality in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), as follows:

> [McCree argues that] when the State "tips the scales" by excluding prospective jurors with a particular viewpoint, an impermissibly partial jury results. We have consistently rejected this view of jury impartiality, including as recently as last Term when we squarely held that an impartial *jury* consists of nothing more than "*jurors* who will conscientiously apply the law and find the facts."

*Id.* at 476 U.S. 178, 106 S.Ct. at 1767. (Emphasis in original.)

The record reveals that the jurors passed for cause were individuals who would conscientiously apply the law and find the facts. Neither the law nor the facts in the record support Enno's argument concerning alleged impartiality of the jury and we affirm the trial court's decision excusing the four jurors for cause pursuant to I.C. § 19–2020(9).

## IV.

## EX PARTE JURY INSTRUCTION

■ At the conclusion of the evidentiary portion of the trial, the court presented to counsel a copy of proposed jury instructions numbered 1 through 35. Verdict forms were not included with those instructions. At the jury instruction conference a question concerning a verdict form was raised and the court verbally stated to counsel that it would prepare a verdict form in essentially the following language:

> We find the defendant guilty of, then there will be first degree murder, then a check mark for guilty or not guilty, then if you find the defendant not guilty of first degree murder, you may consider the lesser included offense of second degree murder, ...

When the case was finally submitted to the jury a verdict form in the format stated by the trial court and an *additional* instruction were submitted. The additional instruction, No. 36, stated in part:

> You will note on the Verdict form that you are first to consider the charge of First Degree Murder. If you find the defendant Guilty of First Degree Murder, you need proceed no further but the foreman shall sign the Verdict form and return it into open court.

> If you find the defendant Not Guilty of the charge of First Degree Murder, you shall consider the lesser included offense of Second Degree Murder. ....

Counsel for the parties were not advised however, until *after* the verdict was received that Instruction No. 36 had been submitted to the jury. Enno first asserts that submission of the ex parte instruction is reversible error, and secondly, argues that the jury instruction was an incorrect statement of the law.

Idaho Criminal Rule 30 clearly requires the trial court to read the instructions to the jury in open court. The failure to allow

---

8. **19–2020. Grounds of challenge for implied bias.**—A challenge for implied bias may be taken for all or any of the following causes and for no other:

....

8. Having formed or expressed an unqualified opinion or belief that the prisoner is guilty or not guilty of the offense charged.

counsel a prior opportunity to review the instruction, make objections on the record, and to then read the instruction to the jury in open court was obviously error. However, in *State v. Randolph*, 102 Idaho 153, 627 P.2d 782 (1981), this Court held that an ex parte instruction that was a correct statement of the law was harmless error. Thus, the dispositive question on this issue is whether jury Instruction No. 36 was a correct statement of the law.

Enno argues that the wording of Instruction No. 36 requires the jury to acquit him of first degree murder before it can consider second degree murder. Enno claims that an "acquittal first" instruction improperly invades the province of the jury. *See Spierings v. Alaska*, 479 U.S. 1021, 107 S.Ct. 679, 93 L.Ed.2d 729 (1986) (White, J. dissenting from denial of cert.). Enno cites *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), and argues that in Idaho an "acquittal first" instruction is not a correct statement of the law.[9]

In *United States v. Tsanas*, 572 F.2d 340 (2d Cir.), *cert. denied*, 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978), the Second Circuit Court of Appeals held that when a defendant reasonably requests a particular form of progressive instruction, failure to give the requested instruction was reversible error. In this case, however, Enno did not request any form of progressive instruction. Instruction No. 26 instructed the jury concerning the included offenses. Instruction No. 36, which was added after the instruction conference and submitted with the verdict form, was merely a directional instruction. It guided the jury in filling out the verdict form and did not specifically instruct on any issue of substantive law. Instruction No. 36 did not require the jury to acquit Enno of first degree murder before considering second degree murder, but merely instructed the jury that they were to first consider the

charge of first degree murder. Instruction No. 36, when read in conjunction with Instruction No. 26, provided that if the jury was not satisfied beyond a reasonable doubt that Enno was guilty of murder in the first degree then they could consider murder in the second degree. Furthermore, Enno's counsel was informed at the instruction conference that this type of instruction would be given on the verdict form and no objection was made. Although technical error and not recommended procedure, placing this directional instruction in a separate instruction rather than including it with the verdict form was not prejudicial to Enno. Therefore, even though the trial court erred by not reading the instruction in open court or providing counsel with copies prior to the instruction conference, we fail to find prejudice and hold that the error was harmless.

V.

### JURY INSTRUCTIONS

#### A. Intoxication and Specific Intent Instructions.

■ Appellant asserts that the trial court erred by not fully instructing the jury on the law concerning specific intent and intoxication. Although the trial court gave an instruction essentially stating the content of I.C. § 18–116,[10] appellant argues that the lengthier instructions approved in *State v. Hall*, 111 Idaho 827, 727 P.2d 1255 (Ct.App.1986), should have been given. We disagree and hold that the intoxication instruction given adequately stated the law.

Enno sought to prove that he was so intoxicated that he lacked the requisite specific intent to commit murder in the first or second degree. In *State v. Sprouse*, 63 Idaho 166, 118 P.2d 378 (1941), this Court reduced a murder conviction to voluntary

---

9. The instruction approved in *Charboneau* was the same given in this case as Instruction No. 26 in this instant appeal.

10. **18–116. Intoxication no excuse for crime.** —No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.

But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act.

manslaughter because "[w]hile his voluntary intoxication is no excuse for his act, it is to be taken into consideration in determining the existence or non-existence ... of malice aforethought which distinguishes murder from voluntary manslaughter." *Id.* at 170, 118 P.2d at 379. It is well established in Idaho that the degree to which intoxication affects intent is a question to be resolved and determined by the jury. *State v. Gratiot,* 104 Idaho 782, 663 P.2d 1084 (1983); *State v. Gailey,* 69 Idaho 146, 204 P.2d 254 (1949). In the instant case the trial court followed the statutory language of I.C. § 18–116 when instructing on intoxication and intent. The instruction reads as follows:

> YOU ARE INSTRUCTED THAT there is an Idaho statute as follows:
>
> > "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, you may take into consideration the fact the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."
>
> Whether or to what extent the defendant was under the influence of intoxicants is for you to decide.

In *State v. Hall,* 111 Idaho 827, 727 P.2d 1255 (Ct.App.1986), the trial court added an additional instruction explaining the effect of I.C. § 18–116 on specific intent.[11] The Idaho Court of Appeals held that the two instructions when read together were adequate to state the law. Although the additional instruction given in *Hall* further explained the relationship between intoxication and specific intent more than is stated in I.C. § 18–116, we note that the instructions given by the trial court in the instant case, when read together and considered as a whole, adequately explain the law and set forth defendant's theory of the case. Instructions that adequately and correctly state and explain the law are sufficient. *See State v. Gailey,* 69 Idaho 146, 204 P.2d 254 (1949); *cf. Fish Breeders of Idaho, Inc. v. Rangen, Inc.,* 108 Idaho 379, 383, 700 P.2d 1, 5 (1985); *McBride v. Ford Motor Co.,* 105 Idaho 753, 760, 673 P.2d 55, 62 (1983).

The lengthier instruction approved in *Hall* does not add any new law, but merely further explained the effect that intoxication may have on intent, premeditation and malice. Those issues were adequately covered by other instructions given by the trial court. Such an instruction as approved in *Hall* would not have been improper, but in light of the instructions actually given by the trial court in the instant case would have been unnecessary. Requested instructions, even if correct statements of the law, need not be given if the subject matter is adequately covered in other given instructions. *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984). Considering and reading instructions as a whole we hold that the law concerning the effect of intoxication on specific intent, premeditation and malice, was adequately covered and correctly stated. The jury only need be adequately instructed on the law applicable to the case as was done by the trial court in this case. The trial court is not required to give a complete dissertation on criminal law to the jury, *State v. Reel,* 19 Idaho 463, 113 P. 721 (1911), and therefore,

---

**11.** The additional instruction given in *State v. Hall,* 111 Idaho 827, 727 P.2d 1255 (Ct.App. 1986), is as follows:

> When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the acts were committed upon which the charge is based, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming a specific intent or mental state essential to constitute the crime or degree of crime with which he is charged.
>
> If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state.

*Id.* at 835, 727 P.2d at 1262–63.

we find no error in the intoxication instructions.

### B. Reasonable Doubt.

■ Appellant claims that the trial court failed to give an instruction defining reasonable doubt in the language approved in *State v. Cotton,* 100 Idaho 573, 602 P.2d 71 (1979), and *State v. Holm,* 93 Idaho 904, 478 P.2d 284 (1970). In *Holm* and *Cotton* this Court held that California Jury Instruction 2.90 is preferred and should be used by the trial courts in criminal cases.

In the instant action the jury instruction defining reasonable doubt is not in the same language as that approved in *Cotton* and *Holm,* but rather defined reasonable doubt as follows:

The State must prove all the material elements of the offense charged by the Information to be true beyond a reasonable doubt before the defendant can be found guilty. A reasonable doubt means exactly what the words imply in the usual and ordinary sense. Such a doubt exists when you do not have an abiding conviction that the offense charged has been proven or your reasonable judgment is not convinced to a moral certainty of the truth of the charge.

"Reasonable doubt" does not mean a vague or shadowy or possible doubt or uncertainty, but a doubt that has a common sense and reason for its basis and arises from the whole of the evidence. It is doubt that would cause a reasonably prudent person to hesitate and pause in important transactions of life. If, after fairly considering all the evidence, you have a reasonable doubt whether guilt has been satisfactorily shown, you should give the defendant the benefit of that doubt and find them not guilty.

While this jury instruction does not follow the instruction approved in *Cotton* and *Holm,* it is not a misstatement of the law. Reversal is not required where an instruction does not contain a misstatement of the law. *State v. Cotton,* 100 Idaho 573, 602 P.2d 71 (1979). Appellant does not indicate which, if any part of the language of this instruction, was an incorrect statement of the law or was prejudicial to him. Although this instruction was not the same as the instruction approved and sanctioned in *Cotton,* it is not sufficiently confusing, erroneous or misleading to require reversal.

### C. General Versus Specific Intent.

■ Appellant complains that the trial court failed to instruct the jury on the distinction between general and specific intent. Appellant also complains that the instructions as a whole indicate that proof of general criminal intent is sufficient to support a conviction of murder in the first degree. A review of the instructions, when read and considered as a whole, reveals that this contention is without merit. Instruction No. 13 [12] requires the jury to find the joint union of act and intent consistent with I.C. § 18–114 and also contains language from I.C. § 18–115 allowing the jury to determine intent from the circumstances connected with the offense as well as the state of mind of the defendant at the time of the crime. Instruction No. 14 [13] requires

---

**12.** Instruction No. 13 provides:

You are further instructed that in every crime there must exist a union or joint operation of act and intent.

The intent contemplated above is not an intent to commit a crime, but is merely the intent to knowingly perform the prohibited act.

The intent to perform the act is manifested by the circumstances connected with the offense, and whether or not the defendant was of sound mind and discretion at the time the offense occurred.

**13.** Instruction No. 14 provides:

You are further instructed that the specific intent or mental state in which an act is done may be shown by the circumstances surrounding the commission of the act. You may not find the defendant guilty of the offense charged unless the proved circumstances not only are consistent with the theory that he had the required specific intent but cannot be reconciled with any other rational conclusion.

Also, if the evidence as to any such specific intent is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent and the other to the absence of this specific intent, it is your duty to adopt that interpretation which points to the absence of the specific intent. If, on the other hand, one interpretation of the evidence as to such specific intent appears to you to be reasonable and the

the jury to find specific intent to commit the crime. Instruction No. 22 [14] speaks to specific intent by requiring the jury to find that the "killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation. ..." Furthermore, Instruction No. 16 instructs the jury in the definitions and elements of first and second degree murder and voluntary manslaughter and each definition included the intent necessary to commit the particular crime.

We note that the distinction between general intent and specific intent is a difficult distinction and has been abandoned in the Model Penal Code. *See* LaFave, W. and Scott, A., Jr., *Criminal Law* § 28, p. 202 (1972). The jury need not be instructed in the esoteric distinctions between general and specific intent. In the present case the instructions to the jury repeatedly emphasized that before Enno could be convicted he must have acted with the intent to kill Freeman. We specifically hold that the jury instructions, when read and considered as a whole, adequately instructed the jury concerning the elements of murder in the first and second degree and manslaughter, and the distinctions between each including intent. This is sufficient to instruct the jury and we find no reversible error.

### D. Malice.

■ Appellant argues that although the trial court instructed the jury concerning the definition of malice, it failed to instruct the jury concerning malice aforethought. Instruction No. 18 defined malice and included language from I.C. § 18–4002.[15] In *State v. Dillon*, 93 Idaho 698, 471 P.2d 553 (1970), this Court held that the trial court did not err in giving instructions concerning murder in which the term "malice" rather than "malice aforethought" was utilized. The definition of "malice aforethought" is not synonymous with premeditation. *State v. Dillon*, 93 Idaho 698, 471 P.2d 553 (1970); *see also* LaFave, W. and Scott, A., Jr., *Criminal Law* § 68, pp. 528–530 (1972), in which the development of the term "malice aforethought" is discussed and concludes that the general definition as used today does not literally mean "afore-thought" or premeditation. There is no legal distinction between malice and malice aforethought. *State v. Moeller*, 50 Haw. 110, 433 P.2d 136 (1967). For the reasons set forth in *Dillon* and in the cited authorities we find no error in the trial court's instruction and definition of malice.

### E. Duplicative Instructions.

■ Enno correctly asserts that Instruction Nos. 23 and 24 are duplicative

---

other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable.

**14.** Instruction No. 22 provides:

All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with malice aforethought is murder of the first degree.

The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means thought over beforehand.

If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition, precluding the idea of deliberation, it is murder of the first degree.

The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it

can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death.

**15. 18–4002. Express and implied malice.—** Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

and repetitive. While this repetition is error, it is harmless. The trial judge recognized the duplication when he read the instruction to the jury and instructed them to ignore Instruction No. 24. Furthermore, Instruction No. 2 instructed the jury that they should consider all of the instructions as a whole and that no emphasis is intended if a proposition is stated more than once. Any error was corrected or is harmless.

### F. Refused Instructions.

 Enno requested several instructions all of which basically would have reminded the jury of their duty to return its verdict based on beyond a reasonable doubt findings. We have reviewed the jury instructions as a whole and find no deficiency that would warrant or require giving the requested repetitive instructions. All of Enno's requested instructions were adequately covered in the instructions given the jury in one form or another and thus we find no error.

Jury instructions must be read in their entirety, as a whole, not in their isolated parts. *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984); *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980).

In summary, we have read the jury instructions as a whole and find that together they adequately informed and instructed the jury on the elements of first and second degree murder as distinguished from manslaughter. Where the jury instructions, taken as a whole, correctly state the law and are not inconsistent, but may be reasonably and fairly harmonized, it will be assumed that the jury gave due consideration to the whole charge contained in all the instructions and was not mislead by any isolated portion thereof. *State v. Lankford,* 113 Idaho 688, 747 P.2d 710 (1987); *State v. Tope,* 86 Idaho 462, 387 P.2d 888 (1963). Malice, premeditation and the intent necessary to commit the various degrees of murder as well as manslaughter were all properly defined and an instruction on the effect of intoxication on the element of intent was also given. The jury was properly instructed that the State must prove and the jury must find beyond

a reasonable doubt all of the elements of the crime before Enno could be convicted. The instructions need only adequately inform the jury of the elements of the crime and the law sufficiently for them to perform their duty. In the instant case the instructions given were sufficient to inform and instruct the jury concerning their duty, and we find no reversible error.

### VI.

### PHOTOGRAPHS

 Enno sought a pre-trial ruling prohibiting the introduction of certain photographs and slides. One of the photographs was of the body of the victim at the crime scene, the other three photographs were those used by the pathologist to testify and illustrate the extent of the victim's injuries. Enno asserts that the testimony of the officers concerning the crime scene and other photographs without showing the victim's body were sufficient. Furthermore, Enno argues that the testimony of the pathologist was adequate and the introduction of photographs of the victim showing injuries to the body after she had died were prejudicial and lacked any probative value.

The trial court found four of the ten photographs in question to be probative of the issue of "deliberate intention, provocation and the circumstances attending the killing as it may show an abandoned and malignant heart" and allowed them to be admitted into evidence. The other six photographs and slides were excluded by the trial court.

The applicable rule in determining whether such relevant evidence is admissible is whether its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." I.R.E. 403; *see State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985); *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985); *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973); *State v.*

*Martinez,* 92 Idaho 183, 439 P.2d 691 (1968).

The comments to I.R.E. 403 state:

Rule 403 authorizes the trial court to exclude relevant evidence that it finds, in essence, will do more harm than good to the truth-finding process or the efficiency of the judicial process. The rule recognizes existing case law granting the court broad discretion in the conduct of the trial. It applies to all forms of evidence.

Report of the Idaho State Bar Evidence Committee. Rule 403, p. 1 (1983). The determination of whether or not to admit such evidence is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Windsor,* 110 Idaho 410, 416, 716 P.2d 1182, 1188 (1985); *State v. Abel,* 104 Idaho 865, 664 P.2d 772 (1983).

In several Idaho murder cases photographic evidence of a graphic nature has been admitted. In *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985), we upheld the admission of photographs which depicted bruises and abrasions on the victim's body. Although the photographs were not used by the pathologist to assist him in describing his observations we held that the trial court did not abuse its discretion in admitting the photographs.

In *State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985), this Court held:

The trial court has the discretion to admit into evidence photographs of the victim in a homicide case as an aid to the jury in arriving at a fair understanding of the evidence, as proof of the *corpus delicti,* the extent of the injury, the condition of the body, and for their bearing on the question of the degree and atrociousness of the crime. The fact that the photographs depict the actual body of the victim and the wounds inflicted on her and may tend to excite the emotions of the jury is not a basis for excluding them. *State v. Caudill,* 109 Idaho 222, 706 P.2d 456 (1985); *State v. Bean,* 109 Idaho 231, 706 P.2d 1342 (1985).

A defendant cannot complain that a jury's emotions were excited by evidence which depicts for the jury accurately that a crime was committed and the method, fashion and atrociousness by which the crime was committed.

*Id.* at 109 Idaho 620–21, 710 P.2d at 530–31. (Emphasis added.)

In *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973), this Court approved admission into evidence of four color photographs of the body of a deceased two-year-old boy. Two photographs illustrated the injuries to the child's body and two other photographs taken while the autopsy was being performed showed his skull exposed with the scalp peeled back revealing the nature of the head injuries. This Court in *Beason,* quoting from *State v. Martinez,* 92 Idaho 183, 439 P.2d 691 (1968), stated:

The general rule is that photographs of the victim in a prosecution for homicide duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in question are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, proof of the *corpus delicti,* extent of injury, condition and identification of the body, or for their bearing on the question of the degree or atrociousness of the crime, even though such photographs may have the additional effect of tending to excite the emotions of the jury.

95 Idaho at 277, 506 P.2d at 1350. In concluding that the admission of these four photographs did not constitute error, the Court held in *Beason* that "[t]he trial court was in a far better position to determine whether the probative value was sufficient to overcome any possible inflammatory effect on the jury." 95 Idaho at 279, 506 P.2d at 1352.

Likewise, the district judge in the instant appeal must be afforded that same discretion with respect to the four photographs of the victim's injuries. The four photographs admitted into evidence were graphic evidence of the injuries inflicted on Freeman before and after her death. However, as observed by this Court in *Beason,* "[t]he time has come when it should be presumed

that a person capable of serving as a juror in a murder case can, without losing his head, bear the sight of a photograph showing the body of the decedent in the condition or place in which found." 95 Idaho at 278, 506 P.2d at 1351 (quoting from *Napier v. Commonwealth of Kentucky*, 426 S.W.2d 121 (Ky.Ct.App.1968)).

The record confirms that the trial court conducted the required balancing and weighing between probative value and prejudicial effect. *Davidson v. Beco Corp*, 114 Idaho 107, 753 P.2d 1253 (1987). A total of ten photographs were presented to the trial court. Of those ten photographs offered by the State, the trial court only allowed four to be admitted. The trial court balanced the unfair prejudicial value of the photographs with the relative probative value and concluded that the four photographs allowed into evidence were less inflammatory than the other photographs, and that they also clearly contained relevant evidence to a contested issue in the case. We find no abuse of discretion and affirm the trial court's decision to admit the four photographs illustrating the condition of the victim's body.

## VII.

## IMPROPER CHARACTER EVIDENCE

During the course of the trial the State introduced evidence that Enno worked as a bodyguard and chauffeur for one Joe Giron and suggested that he aided Giron in conducting illegal drug business between Salt Lake City and Pocatello. Appellant contends that this evidence of "bad character" was improper and irrelevant. Specifically, Enno claims that the trial court erred by denying his motion for a mistrial after Enno had testified concerning an incident in which Joe Giron showed him cocaine on one trip to Salt Lake City. The testimony which Enno claims should have resulted in a mistrial is as follows:

Q. After this incident that you describe involving opening the trunk, did it ever occur to you that perhaps every trip you were making involved the transportation of cocaine?

A. No, it didn't.

Q. You never thought about that?

A. No. I thought about it, but, I mean, it was in my head and then it was out of my head, you know.

Q. Well, you said you never—didn't I understand you to say that on direct examination you said you never hurt anyone?

A. Excuse me?

Q. Didn't you say on direct examination in response to Mr. Zollinger's questioning that you never hurt anyone?

A. I don't recall saying that.

Q. You never hit anyone unless they hit you first; is that what your testimony is today?

A. That's true.

Q. This work, these illegal activities that Mr. Giron was involved in, it never occurred to you that those illegal activities could hurt someone?

Before Enno could answer the last question his attorney objected and moved for a mistrial. The State responded and argued that this line of questioning was only an attempt to impeach Enno's propensity for truth and veracity. The trial court correctly sustained defendant's objection to the question, however, we find no valid reason to support appellant's argument that a mistrial should have been granted on the basis that the question was asked by the prosecuting attorney.

In closing arguments the State referred to Enno's ring and gloves as well as the fact that he was a bodyguard for a "bad character" and suggested that Enno was a violent person. In his testimony Enno stated that he was not a violent person and never hurt anyone. Idaho Rule of Evidence 404 prohibits any evidence of a pertinent character trait unless it is offered by the accused. However, since such evidence had been introduced and admitted by the accused, the state is allowed to rebut that evidence. We find no reversible error in the State's closing argument, particularly in light of the fact that no objection was made.

Enno argues that the State's reference in closing arguments to unproved circumstan-

tial evidence that he took marijuana and money from the deceased victim was improperly allowed. Again, no objection was made and we find no reversible error.

## VIII.

## CUMULATIVE ERROR

■ A defendant is entitled to a fair trial, but not a perfect trial. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *State v. Estes,* 111 Idaho 423, 725 P.2d 128 (1986). After carefully reviewing the entire record and considering the issues in this case it is clear that although the trial was not perfect, the error complained of is not sufficient to warrant reversal and a new trial in this case. A fair and impartial jury was impaneled and evidence was properly received for and against Enno's theory of the case. The jury was adequately instructed on the law and defendant's theory of the case. We find no prejudicial or reversible error and affirm the conviction for murder in the first degree.

## IX.

## SENTENCING

■ Enno asserts that the trial court abused its discretion in imposing the maximum non-death penalty sentence allowed by law. Enno contends that a lesser sentence would satisfy all legitimate goals of sentencing and the interests of society.

The maximum sentence that could have been imposed in this case was the death penalty. Idaho Code § 18–4004. In all cases in which the death penalty may be imposed I.C. § 19–2515(d) requires the trial court to hold a sentencing hearing to hear evidence and arguments in aggravation and mitigation of the offense. The trial court must determine if any of the statutory aggravating circumstances set forth in I.C. § 19–2515(g) exist beyond a reasonable doubt. If the trial court finds that the mitigating circumstances outweigh the gravity of any one aggravating circumstance so found as to make unjust the imposition of the death penalty the court

shall proceed to sentence the defendant to an appropriate term of life imprisonment. Idaho Code §§ 19–2515(f); 18–4004; *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989).

In this case the trial court conducted the appropriate aggravating-mitigating circumstance hearing and found that the mitigating circumstances outweighed any aggravating circumstance. Thus, the trial court was left with the task of determining an appropriate life sentence. The trial court stated:

These mitigating circumstances again, do not excuse the murder but only are for consideration in imposing the death penalty. Weighing all these mitigating factors against each of the aggravating circumstances, this Court finds the weight in favor of the defendant. This is a most difficult and close case to weigh but our criminal law, particularly in a capital case, requires that uncertainty be resolved in favor of the defendant. This Court, therefore, finds and concludes that the mitigating factors outweigh the aggravating circumstances and the death penalty should not be imposed.

The mitigating circumstances which weigh against imposition of the death penalty do not weigh in favor of the defendant's release into society. The anti-social personality, the apparent attitude that general rules of society do not apply to him, the lack of control of his rage and his unwillingness or inability to demonstrate remorse and recognize the horror of his deed, show the defendant to be a very dangerous person and therefore a FIXED life term with no indeterminate portion and no possibility of parole is imposed.

Our review of the entire record demonstrates that appellant's background, psychological makeup, amenability to treatment and rehabilitation were presented to the trial court at the aggravation-mitigation hearing. A forensic psychiatrist testified that Enno suffered to a moderate degree from an anti-social personality disorder that would diminish with age causing a precipitous drop in criminality after age

forty. The psychiatrist further testified that Enno's severe alcoholism problem stemmed from genetic overloading over which he had no control and for which there was no treatment. Based upon his observations the psychiatrist then opined that Enno's history suggested that he was unlikely to be involved in violent crimes in the future. A supervisor for the Department of Probation and Parole for the Sixth District testified that based upon his experience he thought that Enno could be considered for parole sometime in the future. Thus, Enno contends that because of his age and the testimony presented on his behalf, a fixed life sentence is too severe.

It is well established that a sentence imposed within the discretion of the trial court will not be disturbed on appeal absent a clear abuse of discretion. *State v. Dunn*, 91 Idaho 870, 434 P.2d 88 (1967). Appellant has the burden of showing a clear abuse of discretion on appeal. *State v. Chapa*, 98 Idaho 54, 558 P.2d 83 (1976); *State v. Rice*, 99 Idaho 752, 588 P.2d 951 (1979).

Although the determination of a sentence is within the discretion of the trial court we have stated that the sentence should be reasonable, *State v. Nice*, 103 Idaho 89, 645 P.2d 323 (1982); *State v. Dillon*, 100 Idaho 723, 604 P.2d 737 (1979); *State v. Toohill*, 103 Idaho 565, 650 P.2d 707 (Ct.App.1982), and that the trial court should consider proper sentencing criteria. In *State v. Wolfe*, 99 Idaho 382, 582 P.2d 728 (1978), we set forth the sentencing criteria as: "(1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrong doing." *Id.* at 99 Idaho 384, 582 P.2d at 730. Of all of these objectives, the primary consideration is "the good order and protection of society." *State v. Moore*, 78 Idaho 359, 363, 304 P.2d 1101, 1103 (1956); *State v. Toohill*, 103 Idaho 565, 650 P.2d 707 (Ct.App.1982). It is clear that the trial court considered these factors, especially whether Enno posed a continuing threat to society. Although the sentence is a fixed life sentence with no possibility of parole, we find no abuse in the trial court's decision. Consid-

ering the heinous and cruel nature of the crime and that capital punishment was available to the trial court as an alternative based on the aggravating circumstances that were found, the trial court's decision is reasonable and within the maximum statutory limits allowed. Therefore, we affirm.

## X.

## SUMMARY

We have reviewed the record in its entirety and conclude that although there was error committed during the trial proceedings in the peremptory challenge process and in several of the jury instructions, the cumulative effect of that error was not sufficient to require reversal and the sentence imposed is within the statutory limits. Therefore, we affirm the decision of the district court in all respects.

BAKES, C.J., and JOHNSON and McDEVITT, JJ. concur.

BISTLINE, Justice, dissenting.

Being unable to agree with parts VI and IX of the majority opinion, it is in order to write briefly why this case should be returned to the district court for a new trial.

## ADMISSION OF THE PHOTOGRAPHS OF THE VICTIM'S BODY

The majority finds in its Part VI no problem with the district court's admission into evidence four photographs of the victim's body and one of the crime scene. The photographs were highly prejudicial, lacking sufficient probative value to outweigh the prejudice. Unlike some trial court calls, in this particular situation we are as able to make the call as was the trial court. This I say with proper regard for the trial court's less favorable position, meaning that he, as any umpire or referee, is expected to rule instantly. We do not. The district court's admission of these photographs was an abuse of discretion and requires that a new trial be granted.

Enno's brief makes a compelling argument demonstrating that the photographs

genuinely were lacking in probative value and were highly prejudicial. That argument is set out as follows:

## VI.

## THE TRIAL COURT ERRED IN ADMITTING POST MORTEM PHOTOGRAPHS OF THE DECEDENT.

The defendant sought a pretrial ruling prohibiting introduction at trial of certain photographs of the decedent, taken at the scene of the crime and in conjunction with her autopsy, pursuant to IRE 402–03, asserting that they were not relevant to any disputed issue in the case and their prejudicial effect outweighed any possible probative value. (R. Vol. I, pp. 138–139). The trial court held two evidentiary hearings at which the State presented evidence in support of admitting the photographs. (Tr. Vol. I, pp. 1–15; Vol. 0, pp. 4–86). From the evidence presented the trial court concluded that: '[t]he apparent contested issue in this case will be the question of intent and malice.' (R. Vol. I, p. 154). The court felt that certain of the photographs and slide reproductions of the same were probative of the issue of 'deliberate intention, provocation and the circumstances attending the killing as it may show an abandoned and malignant heart.' (R. Vol. I, p. 154). The court held that four photographs and/or slides from the autopsy and one photograph of the crime scene depicting the decedent's body would be admitted at the trial.

Over the defendant's objection, the crime scene photograph, Exhibit 42, and the autopsy photographs, Exhibits 79 through 82, were admitted at trial. Additionally, slide reproductions of Exhibits 79 through 82 were displayed to the jurors over the defendant's objection. (Tr. Vol. II, p. 336, LL. 13–20; and Tr. Vol. III, p. 634, L. 3–p. 669, L. 7).

The evidence in support of admitting the State's Exhibits 79–82 was presented through Dr. Charles Garrison, pathologist. Dr. Garrison indicated that the sole purpose of the photographs and slides was to assist him in adequately describing the nature and extent of the decedent's injuries. (Tr. Vol. 0, p. 19, L. 22–p. 21, L. 9). Dr. Garrison testified that there were apparently five different mechanisms of injury. He indicated that the decedent had been struck in the face with a blunt instrument, similar to a fist, she had been strangled, she was struck with a sharp edged object similar to the board described by the defendant, she had been run over by an automobile, and there had been an attempt to burn the body. He testified that these events occurred in the order described. (Tr. Vol. 0, p. 12, L. 9–p. 14, L. 17).

The injuries resulting from being run over and burned occurred after the decedent had died. These incidents occurred as much as twenty minutes after her death. (Tr. Vol. III, p. 775, LL. 5–25). Dr. Garrison testified that the injuries inflicted prior to the death of the decedent were all depicted in Exhibit 79 which is a photograph of the left side of decedent's face and neck. (Tr. Vol. 0, p. 7, L. 24–p. 9, L. 5; Tr. Vol. III, p. 655, L. 21–p. 657, L. 12; Tr. Vol. III, p. 661, LL. 17–21). Exhibit 81 was of the right side of the decedent's face and depicted the same general injuries as Exhibit 79. Exhibits 80 and 82 depicted those injuries which occurred after decedent's death. (Tr. Vol. III, p. 645, LL. 8–25).

The pretrial evidence in support of admission of State's Exhibit 42 was presented through Don Wycoff, criminalist for the State of Idaho, and Ken Lynn, an officer with the Pocatello Police Department who had training in accident reconstruction. Their testimony indicated that Exhibit 42 accurately depicted the location and condition of the decedent's body when they first observed it at the crime scene. They also indicated that tire tracks which were visible in Exhibit 42 could support either an inference that the body had been run over by an automobile at that location or that the body had been placed there after the car had passed. They also indicated that everything depicted in this photograph, other than the decedent's body, was ac-

curately depicted in other exhibits. (Wycoff, Vol. 0, p. 33, L. 22–p. 34, L. 25; Lynn: Tr. Vol. 0, p. 40, LL. 8–17 & p. 43, LL. 12–22).

Exhibit 42 was admitted at the trial through the testimony of Officer Tim Hillebrandt, evidence custodian for the Pocatello Police Department. Officer Hillebrandt testified he took the photograph admitted as Exhibit 42 and stated that it accurately reflected the location and condition of the decedent's body at the crime scene. Exhibit 42 was admitted over defendant's objection and shown to the jury. (Tr. Vol. II, p. 336, L. 1–22). Neither Don Wycoff nor Officer Lynn testified with reference to Exhibit 42 at the trial. (Tr. Vol. II, pp. 382–405, 419–21, Vol. III, pp. 561–634).

The prejudicial effect of these exhibits was not disputed. The total lack of any probative value of Exhibits 79–82 is best illustrated by the testimony of Dr. Garrison, who proved more than adequate to the task of describing the decedent's injuries in words. (Tr. Vol. III, p. 646, L. 17–p. 653, L. 3). Whatever probative value the nature and extent of the decedent's injuries may have had on establishing the defendant's mental state at or preceding the death of the decedent, it is clear that Dr. Garrison's description of those injuries fully addressed it. The photographs and slide presentation served merely to inflame the passions of the jury.

The photographs and slides admitted as Exhibits 42, 79, 80, 81 and 82 were highly prejudicial. Their probative value was less than slight. Exhibits 80 and 82 showed injuries inflicted on the deceased after her death, perhaps as much as twenty minutes after her death. The prejudicial effect of admitting these photographs greatly outweighed any evidentiary value which they possessed. It is simply not conceivable that the photographs gave any greater indication of the defendant's mental state than did the bare description of his acts. The photographs did not tend in any [way] to establish a disputed fact. They should

have been excluded. See, *State v. Beam,* 109 Idaho 616, 620, 710 P.2d 526 (1985). Appellant's Brief 46–50.

### THE FIXED LIFE SENTENCE

In part IX of its opinion the majority finds no abuse of discretion in the trial judge's sentence of a fixed life term with no indeterminate period and no possibility of parole. Considering the evidence presented on the defendant's background, psychological makeup, amenability to treatment and rehabilitation, all sentencing goals would be satisfied here by imposing a term of years less than the fixed life term. There was an abuse of discretion, and this case should be remanded for resentencing if it is not to be remanded for a new trial.

Dr. Lebegue, a forensic psychiatrist, testified that the defendant was diagnosed as having an anti-social personality disorder of *moderate* degree. Tr. Vol. V, 1012. He testified that the criminal behavior of those diagnosed as having anti-social personality disorder diminishes with age, and that the drop in criminality is rather precipitous and generally occurs between age 40 and 50. Tr. Vol. V, 1013–15, 1035.

Dr. Lebegue testified that the defendant's severe alcoholism was largely the result of genetic loading over which the defendant had no control. Tr. Vol. V, 1016–18. He stated that the defendant's history suggested that he was unlikely to be involved in violent crimes in the future, and that this particular crime was an isolated incident and occurred from a combination of intoxication, anti-social personality disorder, and a response to the severe physical abuse he had experienced as a child. The killing resulted largely from the defendant's suppressed anger from the severe abuse he received. The personality disorder allowed him to act outside of the boundaries established by society in releasing that anger, and defendant's extreme intoxication facilitated release of that anger. With appropriate treatment the suppressed anger could be dealt with. The personality disorder could not be treated, but would decline to the point *that it would not pose a significant risk to socie-*

**412**

*ty at some point in the future.* The alcoholism could not be corrected, but could be controlled. Tr. Vol. V, 1038–39, 1055–57, 1070.

Mr. Newman, the supervisor for the Department of Probation and Parole for the Sixth District, with credentials of fourteen years of corrections education and training, provided the district court with his opinion that the defendant could be considered for parole at some point in the future, adding that Enno would not be released if he displayed any significant problems while incarcerated or did not receive a favorable report on his psychological condition. Tr. Vol. V, 1086–94.

Thus it is seen that Barrette Enno, an eighteen year old man at the time of this crime, is thought to be capable of being rehabilitated. Prior to this incident, at an earlier age, any of his brushes with the law were minor, and there was no history of aggressive behavior. Without doubt, as murder cases come and go, and we have seen many in the past ten or twelve years, this was a bad murder, which is not to say that there are any good murders. Nonetheless, keeping an eighteen year old in prison for the rest of his life entails a huge cost to society, and it is a cost that will unnecessarily be incurred since the defendant in this case is capable of being rehabilitated.